AO 91 (Rev. 11/82)

# CRIMINAL COMPLAINT

FILED
CLERK, U.S. DISTRICT COURT

JUN 5 2015

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

| UNITED STATES DISTRICT COURT | CENTRAL DISTRICT OF CALIFORNIA |
|---|---|
| UNITED STATES OF AMERICA<br>v.<br>ROBERT CONN | DOCKET NO.<br><br>MAGISTRATE'S CASE NO. **M 15 01058** |

Complaint for violation of Title 33, United States Code, Section 1319(c)(4) (tampering with or rendering monitoring method inaccurate)

| NAME OF MAGISTRATE JUDGE<br>HONORABLE CARLA M. WOEHRLE | UNITED STATES<br>MAGISTRATE JUDGE | LOCATION<br>Los Angeles, California |
|---|---|---|

| DATE OF OFFENSE<br>June 4, 2015 | PLACE OF OFFENSE<br>Los Angeles County | ADDRESS OF ACCUSED (IF KNOWN) |
|---|---|---|

COMPLAINANT'S STATEMENT OF FACTS CONSTITUTING THE OFFENSE OR VIOLATION:

**[33 U.S.C. § 1319(c)(4)]**

Beginning on an unknown date and continuing to on or about May 4, 2015, in the County of San Bernardino, within the Central District of California, defendant ROBERT CONN knowingly tampered with and rendered inaccurate, and knowingly caused the tampering with and rendering inaccurate, a monitoring device and method required to be maintained for representative sampling of wastewater effluent, in violation of Title 33, United States Code, Section 1319(c)4) (tampering with and rendering inaccurate a monitoring device and method).

BASIS OF COMPLAINANT'S CHARGE AGAINST THE ACCUSED:

(See attached affidavit which is incorporated as part of this Complaint)

MATERIAL WITNESSES IN RELATION TO THIS CHARGE: N/A

| Being duly sworn, I declare that the foregoing is true and correct to the best of my knowledge. | SIGNATURE OF COMPLAINANT<br>**MARK GIACOMANTONIO**<br>OFFICIAL TITLE<br>SA, U.S. Environmental Protection Agency |
|---|---|

Sworn to before me and subscribed in my presence,

| SIGNATURE OF MAGISTRATE JUDGE(1)<br>CARLA M. WOEHRLE | DATE<br>June 5, 2015 |
|---|---|

(1) See Federal Rules of Criminal Procedure 3 and 54

AUSA Dennis Mitchell, x2484     REC: bond

**A F F I D A V I T**

I, Mark Giacomatonio, being duly sworn, declare and state as follows:

## I.   INTRODUCTION

1.   I am a Special Agent ("SA") with the United States Environmental Protection Agency ("EPA"), Criminal Investigation Division ("CID"), and have been so employed for approximately over three years.  I am currently assigned to the Los Angeles office and am charged with investigating environmental crimes including discharges to publicly owned treatment works, in violation of the pretreatment requirements and monitoring and reporting requirements of the federal Clean Water Act.  I have completed the Federal Law Enforcement Training Center ("FLETC") Criminal Investigator Training Program.  I have also completed the Environmental Investigations Basic Training Program.  I completed both of these programs in Glynco, Georgia.

2.   I have been involved in various criminal investigations for violations of environmental laws, including violation of the Clean Water Act, the Clean Air Act, and the Resource Conservation and Recovery Act.

3.   I am currently a member of an environmental crimes task force, which consists of various local, state, and/or federal law enforcement and regulatory officers.  This task force is specifically designed and dedicated to the

1

investigation and prosecution of environmental violations in the Southern California area.  Among the various members of the task force are representatives from the County Sanitation Districts of Los Angeles County ("LA County Sanitation") and the Inland Empire Utilities Agency ("IEUA").

## II.   PURPOSE OF THE AFFIDAVIT

4.    This affidavit is made in support of a criminal complaint charging ROBERT CONN ("CONN") with tampering with and rendering inaccurate a monitoring device and method, in violation of Title 33, United States Code, Section 1319(c)(4), at a business known as STARLITE RECLAMATION ENVIRONMENTAL SERVICES, INC. ("STARLITE"), which is located at 11225 Mulberry Avenue, Fontana, California 92337 (the "STARLITE's facility").

5.    The statements set forth in this affidavit are based upon my personal observations, my training and experience, my reading of that Affidavit of Kristine G. Wilson which was filed on June 3, 2015 in the Central District of California, case number 15-1030M in the matter of the search of STARLITE'S facility (the "Wilson Affidavit"), and/or information obtained from other investigators, agents, and/or witnesses.  Kristine Wilson is the Resident Agent in Charge ("RAC") of the Los Angeles office of the EPA's Los Angeles Office, and the lead investigator in this investigation.  This affidavit is intended to show merely that there is sufficient probable cause for the

requested complaint and does not purport to set forth all of my
knowledge of or investigation into this matter.  Unless
specifically indicated otherwise, all conversations and
statements described in this affidavit are related in substance
and/or in part only.

III.  OVERVIEW OF STATUTORY AND REGULATORY SCHEME

6.    The Federal Water Pollution Control Act (also known as
the Clean Water Act) ("CWA"), 33 U.S.C. §§ 1251 et seq., is
intended to restore and maintain the chemical, physical, and
biological integrity of our nation's waters.  The CWA imposes
criminal sanctions for both negligent and knowing violations of
the Act.  See 33 U.S.C. § 1319(c).

7.    The CWA prohibits the owner or operator of any source
of a pollutant from introducing such pollutants into a municipal
sewage system in violation of pretreatment standards, which are
further described below, under the CWA.  See 33 U.S.C.
§ 1317(d).

8.    Pursuant to the CWA, 33 U.S.C. §§ 1317(b)&(c), the EPA
has promulgated regulations that establish standards that are
part of a "National Pretreatment Program[1]" ("NPP") for industrial

---

[1] Under the CWA, "pretreatment" includes the reduction of
the amount of pollutants, the elimination of certain pollutants,
or the alteration of the nature of pollutant properties in
wastewater before discharging such pollutants into a POTW.  40
C.F.R. § 403.3(s).

dischargers of wastewater, such as STARLITE, which discharge wastewater into a Publicly Owned Treatment Works ("POTW"). One of the standards under the NPP prohibits discharge of wastewater which has a pH level of less than 5.0. See 40 CFR § 403.5(b)(2).

9.    Under the CWA, the standards that are part of the NPP must be complied with by industrial wastewater dischargers, such as STARLITE. Moreover, a knowing or negligent violation of those standards constitute a criminal violation. See 33 U.S.C. § 1317(d), and 1319(c)(1), (2).

10.   Under the CWA, a publicly owned treatment works ("POTW") includes any devices and systems that are used in the storage, treatment, recycling and reclamation of municipal sewage or liquid industrial wastes. A POTW also includes sewers, pipes and other conveyances if they convey wastewater to a POTW Treatment Plant.[2] See 40 C.F.R § 403.3(q).

11.   The CWA also authorizes a POTW, with an approved pre-treatment program, to control through a permit the wastewater discharges of pollutants[3] by an industrial wastewater discharger,

---

[2] Under the CWA, a POTW Treatment Plant means that portion of the POTW that is designed to provide treatment of municipal sewage and industrial waste. See 40 CFR § 403.3(r).
[3] Under the CWA, a "pollutant" means, among other things, chemical and industrial waste. 33 U.S.C. § 1362(6). In addition, an "owner or operator" is defined as "any person who

4

such as STARLITE, to a POTW.  See 33 U.S.C. § 1342 and 40 CFR § 403.8(f).  A negligent or knowing violation of any limitation or provision of such a permit is a criminal violation under the CWA.  See 33 U.S.C. 1319(c)(1), (2).

12.  Pursuant to its authority under the CWA, the EPA has also promulgated monitoring and reporting regulations requiring industrial wastewater dischargers, such as STARLITE, to submit periodic reports and to monitor and analyze discharges.  See 40 C.F.R. § 403.12.

13.  LA County Sanitation has a pretreatment program that was approved on March 27, 1985 by EPA pursuant to its authority under the CWA.  According to the Wilson Affidavit, information provided by Craig Proctor ("Proctor"), the Pretreatment and Source Control Supervisor for the IEUA, and a pretreatment program approval letter from the EPA that RAC Wilson reviewed, the IEUA operates a pretreatment program originally approved on May 6, 1983 (under the name formerly used by the IEUA, the Chino Basin Municipal Water District) by EPA pursuant to 33 U.S.C. § 1342 and 40 C.F.R. § 403.8.  As such, the pretreatment standards in that pretreatment program, and the permit, issued under the approved pretreatment program, are enforceable under the CWA.

---

owns, leases, operates, controls, or supervises a source."  33 U.S.C. § 1316(4).

14.  LA County Sanitation and the IEUA have entered into a wastewater disposal agreement, wherein LA County Sanitation agrees to accept a portion of IEUA's industrial wastewater flow into a sewer known as the Non-Reclaimable Wastewater Line which then connects to the LA County Sanitation's POTW collection system.  The agreement provides for joint issuance, inspection, and enforcement of industrial user permits.

III.   **STATEMENT OF PROBABLE CAUSE**

A.   Introductory Facts Pertaining to STARLITE

15.  Evidence obtained in this investigation shows that STARLITE has been discharging industrial wastewater into a POTW which has a pH level that violates its permit and a national pretreatment standard.  Evidence shows that these discharges are, at least the result of negligent conduct and may well be the result of knowing conduct.  In addition, the evidence also shows that STARLITE has failed to maintain its pH meter which has provided inaccurate readings, and that STARLITE has removed monitoring data, (strip chart data) which tracks the pH level of the wastewater it discharges.

16.  As set forth in the Wilson Affidavit, California Secretary of State licensing information confirms that STARLITE has been in business since February 11, 2000, and that according to the IEUA, STARLITE first began operating as an industrial wastewater discharger at the SUBJECT PREMISES in October 2013.

17.  On April 7, 2015, during a meeting of the aforementioned environmental crimes task force, RAC Wilson received information about STARLITE.

a.  During that meeting, RAC Wilson learned that: (1) as a centralized waste treatment facility, STARLITE accepts wastewater which has been transported from various clients to its facility; (2) STARLITE then treats the wastewater and discharges the treated wastewater to the Non-Reclaimable Wastewater System which is part of the POTW that is operated by the IEUA; (3) the IEUA, in turn, discharges the treated wastewater to LA County's POTW; (4) STARLITE has been discharging low pH effluent[4] into the POTW, in violation of its pretreatment permit; (5) STARLITE has not been properly operating and maintaining its pH monitoring system; (6) STARLITE had been accepting between 30 and 40 truckloads of wastewater per day from just one customer alone, which amounts to approximately 150,000 to 200,000 gallons per day.  RAC Wilson also learned that the total storage of STARLITE'S facility, i.e., the SUBJECT PREMISES, is only 120,000 gallons, and that STARLITE could be passing wastewater through its system without treating it in order to keep up with the incoming quantity of

---

[4] For purposes of this affidavit, the term "effluent" refers to treated or non-treated wastewater discharged or to be discharged by STARLITE.

wastewater being brought to it.

18.   Various investigative materials provided to RAC
Wilson, including a permit issued to STARLITE and information
pertaining to discharges into a POTW made by STARLITE, indicate
the following:

a.   A Temporary Industrial Wastewater Discharge Permit
("the Permit") was issued to STARLITE on September 11, 2013.
The Permit was re-issued to STARLITE on February 5, 2015, with
modifications. The Permit describes STARLITE as an industrial
user which is also a term in the CWA to describe an industrial
wastewater discharger.

b.   Among various restrictions, the Permit includes a
federal minimum pH limit of 5.0 for the treated wastewater
discharged by STARLITE.  The Permit also requires: (1) proper
operation and maintenance of a pH meter which is used by an
industrial wastewater discharger, such as STARLITE, to measure
the pH level of treated wastewater; (2) representative samples
to be taken of treated wastewater; (3) retention of records on
site for four years of STARLITE'S pH monitoring data; and (4) a
report to the IEUA and LA County Sanitation within 24 hours of
STARLITE becoming aware of a violation arising from a discharge
that violates its pH limit under the Permit.

c.   Samples, known as "grab samples,"[5] taken by IEUA inspectors during the period from September 11, 2014 through February 5, 2015 in the sewer downstream from the STARLITE facility indicate pH levels significantly below the minimal 5.0 limit set forth in the Permit and in the CWA's applicable pretreatment standard.   Several samples taken during the period between December 2014 and January 2015 had pH levels of below 4.0.   Two such samples, taken in February 2015, had pH levels of 2.76 and 2.79.

d.   Numerous one-hour composite samples[6] taken from a covert sewer monitoring device, downstream from the STARLITE facility, during the period from November 25, 2014 through February 4, 2015 were found to have pH levels well below the minimum 5.0 limit set forth in the Permit and in the CWA's applicable pretreatment standard.

e.   A graph with pH results from continuous pH monitoring both upstream and downstream of the STARLITE facility

_____

[5] I am informed that according to the EPA's publication, "Introduction to the National Pretreatment Program," a "grab sample" refers to a sample that is taken from a waste stream on a one-time basis with no regard to the flow of the waste stream. A single grab sample should be taken over a period of time that is not longer than 15 minutes.
[6] I am also informed that according to the EPA's publication, "Introduction to the National Pretreatment Program," a "composite sample" refers to a series of samples of treated wastewater that are taken over a period of time and weighted by flow rate.

9

for the time period from February 12, 2015 through May 7, 2015 shows that during this period the pH level from upstream of the STARLITE facility had pH levels were 7.0 and above.  However, during that same period, the graph indicates that downstream of the STARLITE facility there were many occasions when the pH level was between 2.5 and 4.0.[7]

f.  A negligent or knowing discharge of wastewater with a pH of less than 5.0 for treated wastewater discharged by STARLITE constitutes a violation of the Permit and the applicable pretreatment standard, and, consequently, a criminal violation of the CWA.  See 33 U.S.C. § 1319(c)(1), (2)

g.  As described in the Wilson Affidavit, an aerial photograph that was taken by Michael Barber ("Barber"), a Senior Pretreatment and Source Control Inspector with the IEUA, during a San Bernardino County Sheriff's Department flyover on March 28, 2015 at approximately 12:20 a.m.  According to Barber, the image shows the sample box at the STARLITE facility which is the receptacle in which treated wastewater is placed for testing by STARLITE during discharge.  The Permit requires that STARLITE take representative wastewater samples which must be collected

---

[7] I am informed that Proctor has informed RAC Wilson that the downstream covert sewer monitoring device is located at a point in the sewer that is downstream of the SUBJECT PREMISES and two other businesses.  RAC Wilson is also informed that, based on monitoring records, neither of these two other businesses has had low pH wastewater discharges.

in such a way that they are representative of the total
discharge generated by a typical day's operations.  While it is
not clear whether STARLITE was discharging treated wastewater at
the time that the photograph was taken, the image in the aerial
photograph appears to show that the pH probe is not in the
sample box.  I am informed that records indicate that STARLITE
has discharged treated wastewater at various times, including
late evening hours.  Accordingly, the fact that the pH probe
does not appear to be in the sample box raises a concern on
whether STARLITE has been complying with the Permit requirement
to take representative samples.

    19.  Based upon my review of the Wilson Affidavit,
inspection reports provided to RAC Wilson by Barber and/or other
information to RAC Wilson, I am informed that:

        a.  During a September 11, 2014 inspection at the
STARLITE facility, an IEUA inspector, using his own pH meter,
tested the pH level from a grab sample taken from the sample
box.  The pH reading for that sample was 3.66.  However,
STARLITE's pH meter, which was measuring the pH level of the
treated wastewater in the sample box, showed a pH level of 6.4.
The IEUA inspector also reviewed the pH calibration logbook for
STARLITES'S pH meter and found that the pH meter had last been
calibrated on August 16, 2014, which was 26 days past the
required due date for calibration.  Subsequently, a notice of

violation was issued to STARLITE on September 24, 2014 for failure to properly maintain pretreatment and monitoring equipment.

b.  During an October 14, 2014 inspection conducted by Barber and IEUA Inspector Branden Hodges at the STARLITE facility, a grab sample of treated wastewater was collected from the sample box[8] and tested using the inspectors' equipment and was found to be 4.57.  However, the pH meter used at the SUBJECT PREMISES, which would take continuous readings of the treated wastewater in the sample box, displayed a pH reading of 11.0. Later that day, during a follow-up inspection, another grab sample of treated wastewater was taken from the sample box, using the inspectors' equipment, and its pH level was found to be 9.52.  However, the pH meter used at the STARLITE facility showed that the pH of the wastewater in the sample box was only 4.2.  The inspection report, dated October 16, 2014, for these inspections indicates that a STARLITE employee told Barber that STARLITE'S pH probe cable was damaged and was causing inaccurate readings.

c.  During the October 14, 2014 follow-up inspection at the STARLITE facility, Barber reviewed the pH strip chart

---

[8] I am informed that the sample box is the legal sample point for testing of treated wastewater.  In other words, it is the effluent or treated wastewater in the sample box which is tested for its pH level.

12

data[9] and found that some of the strip chart data had been removed. The inspection report indicates that ROBERT CONN, the Environmental Consultant for STARLITE, stated that the removed portion of the strip chart data was in his office. CONN then provided Barber with another portion of strip chart data, but Barber found that about four hours of pH readings was still missing. According to the inspection report, when questioned about the missing data, CONN became agitated and uncooperative. After more questioning, CONN ultimately admitted that he did not know what happened to the missing strip chart data.

20. As stated in the Wilson Affidavit, on May 18, 2015, Barber informed RAC Wilson that he had checked the IEUA's records and found that STARLITE has never notified the IEUA of a pH violation detected by its internal pH monitoring system.

IV. EXECUTION OF SEARCH WARRANT AND ARREST OF CONN

21. On June 4, 2015, I attended the execution of a search warrant issued on June 3, 2015 for the STARLITE facility. I have also reviewed notes provided to me by RAC Wilson and verbal information received from RAC Wilson pertaining to statements made by witnesses during interviews conducted during and after the execution of the warrant.

---

[9] I am informed that strip chart data refers to the graph data indicating pH level of treated wastewater at STARLITE. The strip chart data is taken from pH monitoring equipment which is kept at the STARLITE facility.

22.  Based upon my personal observations, my review of the Permit, and information provided to me by RAC Wilson, John Boyd, Supervising Industrial Waste Inspector II for LA County Sanitation and/or David Lee, Supervising Industrial Waste Inspector for LA County Sanitation, I have observed and/or learned the following:

a.  Upon arrival at the STARLITE facility at approximately 7:37 a.m.. RAC Wilson went to the back process area where the sample box was located.  She observed a strong vinegar smell, opened the lid of the sample box, and observed that the discharge pipe in the sample box was discharging effluent.

b.  RAC Wilson took a sample of the effluent, tested it, and found that its pH level was 2.96.

c.  RAC Wilson also observed that the pH meter at the STARLITE facility was in a bucket of water instead of the sample box.  The water in the bucket was brownish in color.

d.  IEUA and LA County Sanitation inspectors traced back the pipes from the sample box and determined that the 2.96 wastewater being discharged to the sewer came from one of STARLITE'S storage tanks and was being discharged to the sewer without being treated, and thus, the pre-treatment system at STARLITE was being bypassed.

e.  The facts set forth in subparagraphs (a) through

14

(d) of this paragraph indicate violations of the following requirements under the Permit. First, under the Permit, STARLITE is required to have the pH probe in the sample box at the time that a discharge of effluent is taking place. Since the pH probe was in a bucket of water at that time, STARLITE was in violation of its Permit. Second, the Permit prohibits the bypassing of required pretreatment equipment unless a bypass is unavoidable to prevent loss of life, personal injury or severe property damage.[10] Since the wastewater was being discharged to the sewer without being pretreated, STARLITE violated the bypass prohibition.

      f.  While at the STARLITE facility during the execution of the warrant, RAC Wilson also observed an ISCO sampler next to the sample box.[11] RAC Wilson and I observed that the sampling hose from the ISCO sampler led to another bucket of water instead of the sample box. According to RAC Wilson, EPA Special Agent Robert Driscoll heard the hose suctioning water out of that bucket. RAC Wilson has indicated that the ISCO sampler was collecting samples from a bucket of water instead of

---

[10] While at the STARLITE facility, neither RAC Wilson nor I saw anything at the STARLITE facility that indicated that the bypassing of pretreatment equipment was allowable under the Permit.

[11] I am informed that an ISCO sampler is a device that is used to collect  treated wastewater to be analyzed to determine the concentration of various chemical elements which are subject to limitations under the Permit.

collecting samples of effluent from the sample box. This
indicates another violation of the Permit. Specifically, the
Permit requires STARLITE to take representative samples that
should be taken over a 24-hour period of operation. The Permit
requires STARLITE to collect samples "in such a way that they
are representative of the total discharge generated by a typical
day's operations." Since the ISCO sampler was collecting
samples, the fact that it was diverted to take samples from a
bucket of water indicates that STARLITE was violating this
Permit requirement.

g. During the execution of the warrant, Andrew Hucks,
an operator for STARLITE, was interviewed by EPA SA Patrick
Coyne and later by RAC Wilson. While being interviewed by RAC
Wilson, Hucks stated that the first thing he did that morning
was to put the pH probe in a bucket of water. In addition,
Hucks said that CONN told him to do that the night before so
that the data would match the data collected from the ISCO
sampler. Hucks also stated that the reason why the bucket of
water was brownish in color was that CONN had instructed that
coffee be put into the bucket in order to make the bucket of
water look more realistic.

(1). According to information provided by RAC
Wilson, RAC Wilson also reviewed recorded footage from a closed
circuit television system at the STARLITE facility. She

16

observed that at 6:05 a.m. on June 4, 2015, on the recorded

footage, an individual in a black hooded sweatshirt approaching

the pH meter, opening it, looking and writing something in a log

book.   RAC Wilson also observed that at 6:06 a.m. on the

recorded footage, the individual picked up a bucket, and that at

6:07 a.m., the individual lifted the lid of the sample box and

pulled something out and leaned down to the bucket.

      h.   After the execution of the warrant, RAC Wilson

interviewed Milton Esquivel ("Esquivel"), an employee at

STRLITE, by telephone.   During this interview, Esquivel stated

that on at least one occasion, he observed CONN tell "kids" to

put the pH probe in a bucket of water.   Esquivel also said that

someone named Fernando had a photograph of CONN putting the pH

probe from the sample box into a bucket.

      i.   After the execution of the warrant, RAC Wilson

also interviewed Fernando Torres ("Torres"), a night operator at

STARLITE, by telephone.   During this interview, Torres stated

that CONN would tell him to put the pH probe into a bucket when

they were discharging and when the pH probe should have been in

the sample box.   Torres also indicated that he and other people

at STARLITE had a photograph of CONN putting the pH probe into a

bucket.

      j.   During the execution of the warrant and after the

execution of the warrant, CONN was interviewed.   During the

first interview, CONN was interviewed by EPA RAC for San Diego, Leslie Carroll. During that interview, CONN stated that he instructed workers to have the ISCO sampler sample from a bucket of water because for the past few days there had been an issue with the waste stream from a particular customer which had a high COD. From my review of the Permit and my experience, I understand that COD refers to chemical oxygen demand, and the level of COD refers to how much treatment is needed to clean wastewater.

k. During subsequent interviews of CONN, which I and Special Agent Driscoll conducted after arresting CONN and after Special Agent Driscoll advised CONN of his Miranda rights, CONN repeatedly denied that he had any involvement in removing the pH probe from the sample box or that he had instructed anyone to do so. CONN, who referred to himself as a Vice President of STARLITE, also speculated that two employees, "Andrew" and/or "Cameron," may have been the ones who were responsible for the removal of the pH probe.

IV.  CONCLUSION

23.  Based on the foregoing facts, I believe there is probable cause to issue a criminal complaint charging ROBERT

18

CONN with violating 33 U.S.C. § 1319(c)(4) (tampering with and rendering inaccurate a monitoring device and method).

_____ /s/ _____

Mark Giacomantonio
Special Agent
Los Angeles Resident Office
U.S. Environmental Protection
Agency-Criminal Investigation
Division

Subscribed and sworn to before me
on this ___S___ day of June 2015

_____
CARLA M. WOEHRLE
United States Magistrate Judge

19